[Cite as *Gates v. Leonbruno*, 2016-Ohio-5627.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103738**

# TANNER S. GATES, BY HIS LEGAL GUARDIAN, LISA A. GATES

PLAINTIFF-APPELLEE

vs.

# OFFICER GREG LEONBRUNO, ET AL.

DEFENDANTS-APPELLANTS

**JUDGMENT:**
REVERSED; REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. 14-CV-824344

**BEFORE:** E.A. Gallagher, J., Keough, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** September 1, 2016

**ATTORNEYS FOR APPELLANT**

James A. Climer
Frank H. Scialdone
John D. Pinzone
Mazanec, Raskin & Ryder Co., L.P.A.
100 Franklin's Row
34305 Solon Road
Cleveland, Ohio 44139

Thomas G. Lobe
Law Director – City of Willoughby Hills
Thomas G. Lobe L.P.A.
614 W. Superior Avenue, Suite 1300
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Jamie R. Lebovitz
Brenda M. Johnson
Jordan D. Lebovitz
Nurenberg, Paris, Heller & McCarthy Co., L.P.A.
600 Superior Avenue East, Suite 1200
Cleveland, Ohio 44114

Terry H. Gilbert
Friedman & Gilbert
55 Public Square, Suite 1055
Cleveland, Ohio 44113

Larry Lashinsky
415 Wayne Street
P.O. Box 487
Hollidaysburg, Pennsylvania 16648

EILEEN A. GALLAGHER, J.:

{¶1} Defendant-appellant Greg Leonbruno appeals the trial court's denial of his motion for summary judgment in this personal injury action brought by plaintiff-appellee Tanner Gates by his legal guardian, Lisa Gates to recover for injuries he sustained as a passenger in a single-car accident following an alleged high-speed police pursuit. For the reasons that follow, we find that the trial court erred in denying Officer Leonbruno's motion for summary judgment on the basis of immunity and reverse the trial court's judgment.

**Factual and Procedural Background**

**Attempted Traffic Stop, Alleged Police "Pursuit" and Crash**

{¶2} On the evening of April 16, 2013, Gates was a passenger in a silver 2003 Subaru WRX sedan (the "Subaru") driven by a friend, Joshua Boggs. Gates was 20 and Boggs was 19. The two men had met while attending classes at the PowerSport Institute, a school for motorcycle mechanics and technicians, and had been out drinking and visiting a friend who bought and sold motorcycles.

Officer Leonbruno, a Willoughby Hills patrol officer, was conducting stationary traffic enforcement in the parking lot of Rainbow Muffler on Bishop Road in Willoughby Hills, one block south of the entrance ramp to I-90 east, when the Subaru drove past him. He was on solo patrol in a marked police vehicle with the headlights on. At approximately 11:30 p.m., while he was sitting in his patrol vehicle, Officer Leonbruno observed the Subaru approaching at what he believed to be "a higher rate of speed than normal." He

activated a handheld laser unit and confirmed that the Subaru was traveling at 40 m.p.h., 15 miles above the posted 25 m.p.h. speed limit. The Subaru was not weaving and there is no indication that the Subaru's driver was violating any other laws.

{¶3} As the Subaru passed by Officer Leonbruno, he was able to see that the vehicle was occupied by at least two white males. He also noticed that it appeared to be a high-performance vehicle or "rally car type that you see on the video games." Officer Leonbruno testified that he did not believe the driver of the Subaru looked his way as the vehicle passed by.

{¶4} Officer Leonbruno drove onto Bishop Road behind the Subaru in his marked patrol vehicle, intending to conduct a traffic stop. He did not, however, immediately activate his sirens or overhead lights. Officer Leonbruno followed the Subaru from Bishop Road onto the I-90 east entrance ramp. Officer Leonbruno testified that by the time he approached the top of the entrance ramp, the Subaru was "almost all the way down the ramp," indicating that the Subaru had been accelerating rapidly. Although he had not yet activated his overhead lights or sirens, Officer Leonbruno testified that it was still his intention to conduct a traffic stop of the vehicle for speeding on Bishop Road. As he traveled on the entrance ramp, Officer Leonbruno activated his dash mounted radar unit and a radar reading showed that the Subaru was now traveling 82 m.p.h. in a 60 m.p.h. zone. At that time, the Subaru was "[a]t the very bottom of the ramp if not a little bit further" and was continuing to accelerate along I-90 east.

{¶5} Officer Leonbruno followed the Subaru onto I-90 east, "continually increasing" his speed. Once he was approximately 100 yards from the bottom of the entrance ramp to I-90 east, he activated his overhead lights and sirens. The activation of the overhead lights and sirens also activated a dash camera, which recorded Officer Leonbruno's attempt to catch up to the Subaru.

{¶6} By the time Officer Leonbruno activated his overhead lights and siren, the Subaru was approximately "a couple hundred yards" ahead of Officer Leonbruno's patrol car, i.e., approximately 300 yards past the entrance ramp, and was continuing to accelerate along I-90 east. Officer Leonbruno radioed the Willoughby Hills police dispatcher advising that he was "attempting to catch up to a violator."[1] The Subaru continued traveling on I-90 east at a high rate of speed, signaling as it changed lanes. Officer Leonbruno testified that traffic was "light" and that he did not know whether the Subaru was changing lanes to get around other vehicles or was simply choosing to change lanes. Officer Leonbruno passed several vehicles, at times passing in the right lane, as he attempted to catch up to the Subaru.

{¶7} Based on his visual observation of the Subaru and his own speedometer, Officer Leonbruno estimated that the Subaru was traveling in excess of 100 m.p.h. on I-90 east. Officer Leonbruno testified that although he did not know his exact speed — i.e., it "varied throughout the entire time" he was traveling on the highway — it was

---

[1] The audiorecordings of Officer Leonbruno's communications with the dispatcher and Sergeant Gerardi are not part of the record.

somewhere "in between 80 [m.p.h.] and 150 [m.p.h.]" (the maximum reading on his speedometer) as he attempted to catch up to the Subaru. Notwithstanding Officer Leonbruno's increasing speed, Sean Doyle, Officer Leonbruno's accident reconstruction expert, estimated that the distance between the two vehicles remained at approximately 800-1000 feet. Officer Leonbruno did not recall if other vehicles had to brake suddenly or if any evasive maneuvers were required by other drivers in response to the Subaru's movements. He indicated that he was "pretty concentrated on what [the Subaru] was doing."

{¶8} The Subaru continued along I-90 east until it reached I-271 south, then proceeded along I-271 south in the local lanes, passing from Lake County into Cuyahoga County. Officer Leonbruno testified that as the Subaru traveled around the spur that connects I-90 east to I-271 south, he lost sight of the vehicle for "[a] few seconds" then "picked [it] up" again once Officer Leonbruno was on I-271 south. Officer Leonbruno did not know whether he "was gaining on [the Subaru] or not" by this time.

{¶9} When he reached I-271 south, Officer Leonbruno radioed the Willoughby Hills dispatcher a second time, advising that he was "heading southbound" attempting to catch up to a "silver sedan, well over 100 [m.p.h.]" and that he was "in pursuit." He indicated that he was just passing White Road — the county line — and provided a description of the occupants of the Subaru, i.e., "looks like two white occupants."

{¶10} Sergeant Michael Gerardi, the shift supervisor, was present in the dispatch area and overheard Officer Leonbruno's conversation with the dispatcher. Sergeant

Gerardi inquired as to the reason for the "initial stop" and whether Officer Leonbruno could get the vehicle's license plate number. Officer Leonbruno responded that he attempted to stop the vehicle for a speeding violation. He further indicated that, due to the distance between his vehicle and the Subaru, he had been unable to get the vehicle's license plate number, but that he was now "almost close enough to get a tag." Officer Leonbruno testified that he saw the back of the vehicle and the outline of where the license plate was mounted but never got close enough to view the license plate itself.

{¶11} Officer Leonbruno continued to follow the Subaru as it traveled along I-271 south, with his lights and siren activated, attempting to catch up to it. The Subaru continued to travel at a "high rate of speed" and change lanes, maneuvering around and passing slower traffic. Officer Leonbruno testified that he was "continuing to speed up gradually" and was able to "maintain a visual" on the Subaru's taillights. He indicated that, as with I-90 east, traffic on I-271 south was "light" and that he did not notice any drivers in the area being forced to take evasive actions to avoid the Subaru.[2]

{¶12} At the 36.8 mile marker, Officer Leonbruno radioed his location to the dispatcher and advised that the Subaru was exiting I-271 south at Wilson Mills Road. As

---

[2]The dash camera video confirms that, once activated, Officer Leonbruno kept his overhead lights on continuously, that the road was well lit and traffic was relatively light, that the patrol vehicle was traveling at a much higher rate of speed than other traffic and was maneuvering around other traffic — at times, passing on the right — and that the patrol vehicle remained a substantial distance behind the Subaru for most of the alleged pursuit. There is nothing in the dash camera video that suggests that other drivers in the area were forced to take any evasive actions to avoid the Subaru or Officer Leonbruno's patrol vehicle. There is nothing in the video that suggests that Boggs was aware that Officer Leonbruno was attempting to make a traffic stop of the Subaru.

the Subaru approached the exit ramp, it began decreasing its speed, and Officer Leonbruno began to gain ground on the Subaru, reducing the distance between the two vehicles to approximately 400 feet. As the Subaru traveled down the Wilson Mills exit ramp, Boggs lost control of the Subaru and the vehicle went off the right side of the road, striking a tree on the passenger side.

{¶13} Officer Leonbruno was the first person to arrive at the scene. He testified that he observed the Subaru exit I-271 south at the Wilson Mills exit ramp and saw the vehicle "spin out" with its headlights "turning around" but that he did not observe the entire crash sequence "picture perfect" because he was still on the highway at the time of the crash. Officer Leonbruno immediately dispatched his location and requested emergency services. Boggs and Gates were unconscious inside the vehicle and sustained serious injuries in the accident. EMS arrived, extracted the men from the vehicle and took them to the hospital.

{¶14} Blood tests taken after the crash revealed that Boggs had a blood serum alcohol level of .172% and that Gates had a blood serum alcohol level of .099%. Boggs was later convicted of aggravated vehicular assault and driving under the influence. There is no evidence in the record as to what, if anything, Boggs recalled about the incident, including whether Boggs knew Officer Leonbruno had been attempting to stop the Subaru or what happened in the moments leading up to the crash.

{¶15} The pursuit lasted 110 seconds from the time Officer Leonbruno activated his sirens until the Subaru crashed.

**Willoughby Hills Police Department's Vehicular Pursuit Policy**

**{¶16}** On March 21, 2013, less than a month before the April 16, 2013 incident, the Willoughby Hills police department ("WHPD") revised its vehicular pursuit policy. Christopher Collins, Chief of the WHPD, drafted the revised policy. He testified that the department updated its vehicular pursuit policy to make it "more current with current policies throughout the country." He explained that the prior policy "pretty much allowed pursuits, open ended pursuits for any particular reason" and that the policy was revised to place greater limits on vehicular pursuits.

**{¶17}** The policy defines a "[v]ehicular [p]ursuit" as "[a]n active attempt by an officer in an authorized emergency vehicle to apprehend a fleeing suspect who is attempting to avoid apprehension possibly deploying evasive tactics." Vehicular pursuit is distinguished from "[f]ollowing." The policy states: "Cases where an officer 'follows' a suspect vehicle, but does not engage in apprehension efforts, do not constitute a pursuit. To 'follow' means to drive in close proximity to a vehicle without using any apprehension efforts." "Vehicle [a]pprehension" is defined as "[t]actics and strategies designed to take a suspect into custody who is in a moving motor vehicle including, but not limited to, traffic stops, tire deflation devices, stationary roadblocks, tactical vehicle takedowns or other approved tactics to apprehend a suspect in a moving vehicle."

**{¶18}** As to when a vehicular pursuit is appropriate, the policy states:

> Officers will always consider the safety of the public when responding to calls, pursuing violators or conducting felony stops. All police emergency operations and vehicular pursuits shall be conducted in strict compliance with existing statutes and department policies. **A pursuit is <u>only</u> justified**

**when the officer knows, or has reasonable grounds to believe, the suspect(s) presents a clear and immediate threat to the safety of other motorists, the suspect(s) has committed or has attempted to commit a serious felony, or when the necessity of the immediate apprehension outweighs the level of danger created by the pursuit. <u>Pursuits for misdemeanor offenses, traffic or civil infractions are prohibited.</u>** Officers engaged in emergency vehicle operations shall utilized [sic] both audible (siren) and visual (emergency lights) warning equipment when engaged in a pursuit. All personnel operating departmental vehicles shall exercise due regard for the safety of all persons. A pursuit shall not be initiated while an officer is transporting a prisoner or any person not authorized by department waiver.

(Emphasis sic.)

{¶19} The policy's "procedures" section further provides, in relevant part:

**WHPD Initiated Pursuit within the City of Willoughby Hills**

1.  Decision to Pursue: The responsibility for the decision to initiate a vehicular pursuit rests with the individual officer and must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large.

2.  Any officer in an authorized emergency vehicle may initiate a vehicular pursuit when the suspect exhibits the intention to avoid apprehension by refusing to stop when properly directed to do so. Pursuit may also be justified if the officer reasonably believes that the suspect, if allowed to flee, would present a danger to human life or cause serious injury.

3.  In deciding whether to initiate a pursuit, the officer shall take into consideration:

    a.  The seriousness of the offense and the threat posed by the suspect
    b.  Population density and vehicular and pedestrian traffic
    c.  Weather, road conditions, time of day or night
    d.  The performance capabilities of the pursuit vehicle and the vehicle being pursued
    e.  The potential endangerment of the public caused by the eluding acts of the fleeing violator
    f.  Vehicle speeds
    g.  Alternate means of apprehension
    h.  Possibility of identifying the operator/vehicle at a later

time or date.

4.      Once the decision has been made to pursue, these factors shall continue to be given careful consideration in determining maximum safe speeds throughout the pursuit and whether to continue the pursuit.

5.      The need for apprehension must be constantly weighed against the potential danger created by the pursuit. * * *

{¶20} Officer Leonbruno read and was familiar with the revised policy prior to the incident. Sergeant Gerardi testified that he reviewed the policy with Officer Leonbruno and the other officers in his platoon during roll call when the policy first came out and, a second time, the day before the incident.

{¶21} Officer Leonbruno reviewed the vehicular pursuit policy a third time following the incident when preparing his written narrative for the incident report. He testified that he did not believe his actions constituted a vehicular pursuit and that he reviewed the policy "[b]ecause I need[ed] to justify why I did what I did," including "why it was not a pursuit." He explained:

> The suspect vehicle was not equipped with visual or audible signals to alert other motorists on the roadway to get out of the way. I continued to follow the suspect vehicle with my lights and sirens on in an attempt to get their attention. My intention was to slow them down and get the vehicle stopped so that they would no longer threaten harm to themselves or other vehicles on the roadway.

{¶22} Chief Collins testified that, following the incident, he reviewed the dispatch audiorecordings, the dash camera video, the incident report, the vehicular pursuit policys and spoke with Sergeant Gerardi and Officer Leonbruno about the incident. He concluded that Officer Leonbruno had not engaged in a "vehicular pursuit," was simply attempting to make a traffic stop and "had acted properly within the guidelines of the

policy." He testified that because Officer Leonbruno was not attempting to apprehend a suspect, the policy did not apply and that, in his view, Officer Leonbruno had reasonable grounds to believe that Boggs presented a clear and immediate threat to the safety of other motorists and took appropriate actions in following the Subaru and trying to alert other motorist to the hazard.

{¶23} On March 26, 2014, Gates filed a personal injury complaint against Officer Leonbruno and Sergeant Gerardi, alleging that as a result of their "grossly negligent, willful, wanton, reckless, intentional, extreme and/or outrageous conduct" in the "high speed vehicular pursuit" of Boggs' Subaru, Gates sustained permanent, serious injuries that reduced him to a "semi-vegetative state." The officers filed their answer, denying any wrongdoing and asserting various affirmative defenses, including that Gates' claims were barred by immunity.

{¶24} After the completion of discovery, Officer Leonbruno and Sergeant Gerardi filed a joint motion for summary judgment asserting that (1) they were immune from liability under R.C. 2744.03(A)(6) and (2) their conduct was not the proximate cause of the accident giving rise to Gates' injuries. In support of their motion, the officers submitted (1) deposition testimony from Chief Collins, Officer Leonbruno, Sergeant Gerardi and Boggs, (2) the WHPD vehicular pursuit policy, (3) the WHPD incident report for the incident and (4) an affidavit and expert report from Sean Doyle, P.E., an accident reconstructionist, in which he offered his opinions regarding the "separation distances between the vehicles" throughout the incident. Doyle opined that

at the initiation of the dash camera video, 1000 feet separated the vehicles, that 20 seconds later, the vehicles were 800 feet apart and that the separation distance "remained largely unchanged" until 110 seconds into the recording when the separation distance closed to approximately 400 feet.

{¶25} Gates opposed the motion. In support of his opposition, Gates submitted, in addition to testimony and exhibits from the depositions filed by Officer Leonbruno, additional deposition exhibits and deposition testimony and expert reports from several of the parties' experts on issues relating to the standard of care for police officers engaged in police pursuits and proximate causation. Litigation consultant and law enforcement trainer Melvin Tucker opined that initiation of the alleged pursuit in this case violated WHPD's vehicular pursuit policy and other "well-established standards and training for pursuits." He claimed that there was no need for an immediate apprehension of Boggs on a speeding violation and that the danger to the public from pursuing Boggs was greater than could be justified under the WHPD pursuit policy. He claimed that after "maybe a second and a half," once it became clear that the vehicle was not going to stop, Officer Leonbruno should have terminated pursuit of the Subaru and that his continued pursuit of the Subaru after that point was reckless. He further claimed that the crash of the Subaru was "predictable," given the vehicles' high speeds and the driver's decreased visual acuity at night, and that Officer Leonbruno's continued pursuit of the Subaru "substantially contributed" to the crash.

{¶26} Another of Gates' experts, Geoffrey Alpert, a professor of criminology and criminal justice at the University of South Carolina, similarly opined that Officer Leonbruno's pursuit of the Subaru violated the WHPD's pursuit policy, that the pursuit was "unreasonable, reckless, wanton and a willful violation of any discretion [Officer Leonbruno] may had had" and that the continued pursuit of the Subaru was a cause of the crash. Alpert claimed that although the Subaru's speed may have posed a danger to motorists, Officer Leonbruno's pursuit of Subaru increased that danger. Alpert claimed that studies show that suspects fleeing the police almost always slow down after a pursuing officer turns off his lights and sirens and terminates a pursuit.

{¶27} The trial court granted the motion for summary judgment as to the claims against Sergeant Gerardi, concluding that no genuine issue of material fact existed as to whether his conduct was the proximate cause of Gates' injuries. The trial court denied the motion as to the claims against Officer Leonbruno, concluding that genuine issues of material fact existed as to whether (1) his actions were wanton and reckless, thereby depriving him of immunity under R.C. 2744.03(A)(6)(b), and (2) his conduct was the proximate cause of Gates' injuries.

{¶28} Officer Leonbruno appealed the trial court's ruling. In his sole assignment of error, Officer Leonbruno argues that the trial court erred in denying his motion for summary judgment.

**Law and Analysis**

**Jurisdiction Limited to Immunity Determination**

**{¶29}** As an initial matter, we first address this court's jurisdiction to review the issues raised by Officer Leonbruno in this appeal. An appellate court can review only final, appealable orders. Without a final, appealable order, an appellate court has no jurisdiction. *See Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 9; Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2501.02. An order denying a motion for summary judgment is generally not a final, appealable order. *See, e.g., Hubbell* at ¶ 9; *Celebrezze v. Netzley*, 51 Ohio St.3d 89, 90, 554 N.E.2d 1292 (1990). However, R.C. 2744.02(C) provides that "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order." Thus, R.C. 2744.02(C) grants appellate courts jurisdiction to review the denial of a motion for summary judgment based upon immunity. *Hubbell* at ¶ 27 ("[W]hen a trial court denies a motion in which a political subdivision or its employee seeks immunity under R.C. Chapter 2744, that order denies the benefit of an alleged immunity and thus is a final, appealable order pursuant to R.C. 2744.02(C).").

**{¶30}** In this case, Officer Leonbruno asks this court to reverse the trial court's denial of summary judgment based on (1) Gates' inability to establish an exception to immunity under R.C. 2744.03(A)(6) and (2) lack of sufficient evidence of proximate cause. Pursuant to R.C. 2744.02(C), however, we have jurisdiction to consider only whether the trial court properly denied Officer Leonbruno's motion to dismiss on immunity grounds, i.e., whether the trial court's denial of summary judgment denied

Officer Leonbruno "the benefit of an alleged immunity from liability." R.C. 2744.02(C) does not authorize the appellate court to otherwise review the merits of a trial court's decision to deny a motion for summary judgment. *See, e.g., Reinhold v. Univ. Hts.*, 8th Dist. Cuyahoga No. 100270, 2014-Ohio-1837, ¶ 21 ("An appeal from a denial of summary judgment based on sovereign immunity is limited to the review of alleged errors in the portion of the trial court's decision that denied the political subdivision the benefit of immunity."), citing *Riscatti v. Prime Properties Ltd. Partnership*, 137 Ohio St.3d 123, 2013-Ohio-4530, 998 N.E.2d 437, ¶ 20; *CAC Bldg. Properties, LLC v. Cleveland*, 8th Dist. Cuyahoga No. 91991, 2009-Ohio-1786, ¶ 9, fn. 1 (appellate court had jurisdiction to review city's appeal only with respect to issues that were based on the trial court's denial of summary judgment on immunity grounds; other issues city raised on appeal with respect to the denial of its summary judgment motion were not reviewable). Thus, when appealing a denial of a motion for summary judgment on immunity grounds under R.C. 2744.02(C), a party cannot raise other alleged errors concerning the denial of its motion for summary judgment. As this court held in *Hardesty v. Alcantara*, 8th Dist. Cuyahoga No. 102684, 2015-Ohio-4591, this includes a denial of summary judgment based on proximate causation. *Id.* at ¶ 47 (declining to address issues of proximate causation in appeal of denial of motion for summary judgment based on exception to immunity under R.C. 2744.03(A)(6)(b), concluding that "[t]he issue of proximate cause * * * is not yet ripe for review as we only have jurisdiction to address the issue of immunity in this interlocutory appeal").

**{¶31}** In an attempt to circumvent this limitation, Officer Leonbruno argues that (1) the determination of causation is "an essential part of the immunity analysis under R.C. 2744.02(C)" and is "inextricably intertwined" with the trial court's denial of immunity under R.C. 2744.03(A)(6)(b) and (2) this court may exercise "pendent jurisdiction" over the portion of the trial court's order denying summary judgment on the issue of causation. Officer Leonbruno's arguments are not persuasive. First, contrary to Officer Leonbruno's assertions, the determination of whether the exception to immunity set forth in R.C. 2744.03(A)(6)(b) applies is not dependent upon a finding of proximate cause. Proximate causation is not an element of R.C. 2744.03(A)(6)(b). *Compare Makowski v. Kohler*, 9th Dist. Summit No. 25219, 2011-Ohio-2382, ¶ 15-27 (considering issues of proximate causation when reviewing trial court's denial of summary judgment based on alleged exception to political subdivision immunity under R.C. 2744.02(B)(1) "for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority"). Whether immunity or an exception to immunity applies under R.C. 2744.03(A)(6) is a separate and distinct inquiry from whether the officer's conduct was a proximate cause of the harm. *See Hardesty* at ¶ 47.

**{¶32}** Second, we do not agree that the concept of pendent jurisdiction applies to expand the scope of our jurisdiction in this case beyond that which is expressly authorized under R.C. 2744.02(C). Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2501.02. We, therefore, lack jurisdiction to consider Officer Leonbruno's argument that the trial

court erred in denying him summary judgment on proximate causation and address only his argument that the trial court erred in denying his motion for summary judgment based on immunity under R.C. 2744.03(A)(6).

**Standard of Review on Summary Judgment**

{¶33} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

{¶34} Under Civ.R. 56, summary judgment is appropriate when (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party.

{¶35} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

**Immunity under R.C. 2744.03(A)(6)**

{¶36} Officer Leonbruno contends that the trial court erred in denying his motion for summary judgment because he is immune from liability under R.C. 2744.03(A)(6). Ohio's Political Subdivision Tort Liability Act, codified in R.C. Chapter 2744, absolves political subdivisions and their employees of tort liability subject to certain exceptions. Thus, "[i]n Ohio, a 'police officer * * * cannot be held personally liable for acts committed while carrying out his or her official duties unless one of the exceptions to immunity is established.'" *Hunt v. Cleveland*, 8th Dist. Cuyahoga No. 103468, 2016-Ohio-3176, ¶ 25, quoting *Cook v. Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814 (1st Dist.1995). Whether an employee of a political subdivision is immune from liability is determined by applying R.C. 2744.03(A)(6). *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, ¶ 17. Under R.C. 2744.03(A)(6), an employee of a political subdivision is immune from liability, unless one of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

> (c) Civil liability is expressly imposed upon the employee by a section of

> the Revised Code. * * *

{¶37} At issue in this case is the applicability of the exception to immunity set forth in R.C. 2744.03(A)(6)(b), specifically, whether, in continuing pursuit of the Subaru

Officer Leonbruno acted in a "wanton or reckless manner."[3]  As a general matter, whether an employee of a political subdivision is entitled to R.C. 2744.03(A)(6) immunity is a question of law for determination by the court.  *See, e.g., Srokowski v. Shay*, 8th Dist. Cuyahoga No. 100739, 2014-Ohio-3145, ¶ 11, citing *Conley v. Shearer*, 64 Ohio St.3d 284, 291, 595 N.E.2d 862 (1992), and *Feitshans v. Darke Cty.*, 116 Ohio App.3d 14, 19, 686 N.E.2d 536 (2d Dist.1996).  However, whether the employee acted in a wanton or reckless manner under R.C. 2744.03(A)(6)(b) is generally a question of fact for the jury.  *See, e.g., Miller v. Hace*, 8th Dist. Cuyahoga No. 102500, 2015-Ohio-3591, ¶ 17; *Stevenson v. Prettyman*, 193 Ohio App.3d 234, 2011-Ohio-718, 951 N.E.2d 794, ¶ 43 (8th Dist.); *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994).  Thus, a trial court may not grant summary judgment on the basis of R.C. 2744.03(A)(6) immunity unless, based on the evidence, reasonable minds could conclude only that the employee did not act in a wanton or reckless manner.  If reasonable minds could disagree on this issue, then a trial court cannot properly grant an employee summary judgment based upon statutory immunity under R.C. 2744.03(A)(6).

**{¶38}** In *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, the Ohio Supreme Court defined "wanton" and "reckless" as used in R.C. 2744.03(A)(6)(b) as follows, clarifying that they are "different and distinct degrees of care" and are "not interchangeable":

---

[3]Gates does not contend that Officer Leonbruno acted with malicious purpose or in bad faith.

Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. *Hawkins [v. Ivy*, 50 Ohio St.2d 114, 117-118, 363 N.E.2d 367 (1977)]; *see also Black's Law Dictionary* 1613-1614 (8th Ed.2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results).

Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. *Thompson [v. McNeill*, 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705 (1990)], adopting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965); *see also Black's Law Dictionary* 1298-1299 (8th Ed.2004) (explaining that reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm).

*Id.* at ¶ 31, 33-34.

{¶39} The standard for establishing wanton or reckless conduct is "high" and requires consideration of the "totality of the circumstances." *See, e.g., Miller* at ¶ 17; *Adams v. Ward*, 7th Dist. Mahoning No. 09 MA 25, 2010-Ohio-4851, ¶ 27; *Stevenson* at ¶ 43. As such, the determination of whether an officer acted in a wanton or reckless manner in engaging in a vehicular pursuit of a suspect is highly dependent on the facts of each case.

**{¶40}** In evaluating an officer's conduct in vehicular pursuit cases, courts typically consider factors such as: the speed limit of the road, the speed the officer was traveling, whether the officer was traveling in the wrong lane, the time of day, the weather, the officer's familiarity with the road, the extent to which there were other vehicles on the road, whether the officer attempted to pass the pursued vehicle or force it from the road, the nature and seriousness of the offense(s) allegedly committed by the suspect, whether there was a safer alternative than continuing the pursuit, whether the officer admitted to disregarding the consequences of his actions, whether the officer's lights and sirens were activated and whether the political subdivision had a pursuit policy and, if so, whether that policy was followed. *See, e.g., Miller* at ¶ 18, citing *Adams* at ¶ 28; *Stevenson* at ¶ 44-52.

**{¶41}** Officer Leonbruno contends that, in ruling on his summary judgment motion, the trial court applied the wrong standard. He claims that the trial court considered only four factors in evaluating his conduct — i.e., that the pursuit occurred late in the evening, that the pursuit continued through two jurisdictions, the speed of the vehicles and that the pursuit allegedly violated police department policy — instead of the "totality of the circumstances." He further contends that when the totality of the circumstances is considered, no reasonable factfinder could conclude that he acted in a "wanton or reckless manner." We agree.

**{¶42}** On the record before us, viewing the evidence in the light most favorable to Gates and considering the totality of the circumstances, we conclude no reasonable

factfinder could find that, in following the Subaru, Officer Leonbruno acted wantonly, i.e., that he failed to exercise *any* care toward those to whom a duty of care is owed under circumstances in which there is great probability that harm will result, or recklessly, i.e., with conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances. *Anderson,* 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266 at ¶ 33-34.

{¶43} In support of his claim that he did not act wantonly or recklessly, Officer Leonbruno points to evidence that Boggs had accelerated to at least 82 m.p.h. before he attempted to initiate a traffic stop; (2) that once activated, Officer Leonbruno kept his lights and siren on continuously as he followed the Subaru, notifying other motorists of the danger presented by the speeding vehicles; (3) that it was late at night, the road was dry, traffic was "light," the road was "well lit" and the duration of the alleged "pursuit" was less than two minutes and (4) that Officer Leonbruno never interfered with the progression of the Subaru, never came closer than within 400 feet of the Subaru and remained 800-1000 feet behind the Subaru for all but the last few seconds of the alleged pursuit. Officer Leonbruno also points out that there is no evidence that he took any action that caused Boggs to increase his speed or make any evasive maneuvers to avoid apprehension and no evidence that Boggs even knew Officer Leonbruno was behind the Subaru signaling him to stop.[4] In addition, Officer Leonbruno kept in regular contact

---

[4]Although Officer Leonbruno also points out that Boggs was drunk, this fact was not known to Officer Leonbruno during his pursuit of the Subaru. Accordingly, this fact cannot be considered in evaluating Officer Leonbruno's

with the dispatcher as he followed the Subaru, providing complete and accurate information to the dispatcher and his supervisor, Sergeant Gerardi, regarding his actions and those of the Subaru. There was no other means of identifying who may have been driving the Subaru short of following it. Although Officer Leonbruno had been attempting to get the Subaru's license plate number, he never got close enough to the vehicle, prior to the crash, to do so.

{¶44} Gates concedes that Officer Leonbruno was "justified" in following the Subaru for "the short period of time" — which his expert puts at "perhaps one-and-a-half seconds" — "necessary to allow the Subaru's driver to react to his lights and siren" as Officer Leonbruno attempted a traffic stop. However, Gates contends, based on his experts' opinions regarding the standard of care of "modern policing" and the danger associated with high-speed police pursuits, that Officer Leonbruno failed to properly balance the seriousness of the offense that gave rise to the "pursuit" against the danger to the public and the occupants of the Subaru from the "pursuit," that he should have stopped following the Subaru long before it crashed and that Officer Leonbruno's decision not to terminate the "pursuit" of the Subaru once it accelerated to 100 m.p.h. "showed complete disregard" for the safety of other drivers and the occupants of the Subaru.

{¶45} "'By itself, the fact that danger arises when a police officer pursues a fleeing driver is insufficient to present a genuine issue of material fact concerning

conduct.

whether the officer acted recklessly.'" *Gattrell v. Utica*, 5th Dist. Licking No. 15-CA-26, 2016-Ohio-792, ¶ 59, quoting *Sparks v. Klempner*, 10th Dist. Franklin No. 11AP-242, 2011-Ohio-6456, ¶ 20; *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 2002-Ohio-222, 772 N.E.2d 129, ¶ 40 (9th Dist.) ("[T]he fact that danger inheres in high speed chases alone is not sufficient to present a genuine issue of fact concerning whether [a police officer] acted with malicious purpose, in bad faith, or in a wanton or reckless manner."). "'To find otherwise would effectively impose a duty on police officers to refrain from ever pursuing criminal suspects.'" *Gattrell* at ¶ 59, quoting *Sparks* at ¶ 20. Similarly, the fact that Officer Leonbruno did not immediately terminate pursuit once the Subaru began accelerating, did not, in and of itself, render his conduct reckless. As the Tenth District explained in *Sparks v. Klempner*, 10th Dist. Franklin No. 11AP-242, 2011-Ohio-6456:

> [P]olice officers do not have a duty to refrain from all pursuit. * * * [I]f we accepted plaintiffs' argument, we would reach a holding that would encourage suspects to drive recklessly so that police officers would be forced to stop any pursuit or face liability for harm caused by the suspects' driving. We refuse to create such a perverse incentive for suspects. *See Scott v. Harris*, 550 U.S. 372, 385, 127 S.Ct. 1769, 1779, 167 L.Ed.2d 686 (2007) ("[W]e are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger. It is obvious the perverse incentives such a

rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights."). (Emphasis sic.)

*Sparks* at ¶ 22; *see also Gattrell* at ¶ 60.

**{¶46}** Law enforcement officers have a duty to "'apprehend * * * motorists who make the highways dangerous to others.'" *Shalkhauser* at ¶ 46, quoting *Lewis v. Bland*, 75 Ohio App.3d 453, 599 N.E.2d 814 (9th Dist.1991). If we were to adopt the position espoused by Gates — i.e., that a police officer's failure to terminate "pursuit" of a vehicle once it accelerates to 100 m.p.h. is sufficient to establish "conscious disregard" or "indifference" to the safety of others — it would create an incentive for lawless drivers to simply increase their speed to 100 m.p.h. to avoid apprehension, at considerable risk to the public. *Sparks* at ¶ 22. It cannot be said that a police officer must "stop any pursuit" of a vehicle once it reaches a speed of 100 m.p.h. or "face liability for harm caused by the suspects' driving"[5] and the fact that Officer Leonbruno continued to follow the Subaru after it reached speeds of 100 m.p.h. does not, in and of itself, create a genuine issue of material fact as to whether his conduct was "wanton" or "reckless." Although the speed of the vehicles in this case — vehicle speeds in excess of 100 m.p.h. for up to 110

---

[5]Indeed, based on the record in this case, it appears that Gates may have already accelerated to 100 m.p.h. by the time Officer Leonbruno made his way down the entrance ramp to I-90 east and activated his lights and siren to attempt a traffic stop.

seconds — is certainly cause for concern, it is only one of the factors to consider in determining whether Officer Leonbruno acted wantonly or recklessly.

{¶47} Gates also points out that WHPD's vehicular pursuit policy expressly prohibits officers from engaging in vehicle pursuits for traffic offenses. Officer Leonbruno disputes that he violated this policy. He asserts, based on Chief Collins' testimony, that the policy was "intended as" and was "taught to officers as" permitting an officer to engage in a pursuit "when the officer knows, or has reasonable grounds to believe, the suspect(s) presents a clear and immediate threat to the safety of other motorists" and that the Subaru, traveling on the highway at a high rate of speed, in fact, "presented such a threat."

{¶48} In this case, it is not clear when, if ever, during the 110 seconds Officer Leonbruno followed the Subaru, that the attempted traffic stop became a "vehicular pursuit." There is nothing in the record that suggests that Boggs ever realized Officer Leonbruno was attempting to make a traffic stop of his vehicle. When Officer Leonbruno first pulled out behind the Subaru on Bishop Road, he did not have his lights and sirens on. Accordingly, even if Boggs had observed the patrol vehicle at that time, he would have had no reason to believe that the officer was going to attempt a traffic stop of his vehicle. Officer Leonbruno testified that after he activated his overhead lights and siren, Boggs continued to use signals as he changed lanes, and there is no evidence that Boggs modified his actions in any way in response to the lights and siren. Where, as here, a police officer activates his lights and siren in an attempt to make a traffic stop,

some reasonable period of time must be allowed for the officer to attempt to make the traffic stop and for that attempted traffic stop to fail before the officer could be reasonably deemed to be engaging in a "vehicular pursuit" by continuing to follow the suspect's vehicle. Police officers cannot be precluded from attempting to stop vehicles traveling on the highway at excessive speeds simply because they are traveling at excessive speeds. A driver also needs a reasonable period of time to observe and react to a patrol vehicle's lights and siren before he or she could be reasonably deemed to be attempting to evade apprehension. That observation and reaction time may vary depending on the circumstances, but, in any event, certainly cannot reasonably be limited to the "second-and-a-half" proposed by Gates and his expert, particularly, where, as here, the officer's lights and sirens are activated when the patrol vehicle is 800-1000 feet behind the suspect's vehicle and remains that distance behind the suspect's vehicle during virtually the entire time the officer is following the suspect.

{¶49} Even assuming Officer Leonbruno violated the WHPD vehicular pursuit policy, the fact that an officer engages in a vehicular pursuit in violation of police department policy does not, in and of itself, constitute wanton and reckless conduct. As the Ohio Supreme Court explained in *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, at ¶ 37-38:

> [I]t is well established that the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct. *See Higbee Co. v. Jackson*, 101 Ohio St. 75, 90, 128 N.E. 61 (1920); *Payne v. Vance*, 103 Ohio St. 59, 77, 133 N.E. 85 (1921); *Boyd v. Natl. RR. Passenger Corp.*, 446 Mass. 540, 549,

845 N.E.2d 356 (2006); *Wise v. Broadway*, 315 S.C. 273, 276, 433 S.E.2d 857 (1993); *Whitley v. Progressive Preferred Ins. Co.*, 1st Dist. Hamilton No. C-090240, 2010-Ohio- 356, ¶ 16; 2 Restatement of the Law 2d, Torts, Section 500, Comment e (1965).

However, as the Restatement explains,

In order that the breach of [a] statute constitute reckless disregard for the safety of those for whose protection it is enacted, the statute must not only be intentionally violated, but the precautions required must be such that their omission will be recognized as involving a high degree of probability that serious harm will result.

2 Restatement of the Law 2d, Torts (1965) 587, Section 500, cmt. e.

Thus, as we concluded in *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, "[w]ithout evidence of an accompanying knowledge that the violations 'will in all probability result in injury,' *Fabrey,* [70 Ohio St.3d at 356, 639 N.E.2d 31], evidence that policies have been violated demonstrates negligence at best." *Id.* at  92.

**{¶50}** Even assuming Officer Leonbruno violated the WHPD vehicular pursuit policy, there is no evidence in this record upon which it could be found that Officer Leonbruno intentionally violated the policy with knowledge that the violations would "'in all probability result in injury.'" *Anderson* at ¶ 38, quoting *Fabrey* at 356.

**{¶51}** In *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 2002-Ohio-222, 772 N.E.2d 129 (9th Dist.), involving somewhat similar facts, the Ninth District held that reasonable minds could only conclude that a police officer's operation of his patrol vehicle during a high-speed vehicle pursuit was not wanton or reckless. *Id.* at ¶ 42. In *Shalkhauser*, the police officer had attempted to initiate a traffic stop of a pickup truck

after he observed the vehicle veer over the centerline as it crossed a set of railroad tracks and learned, after entering its license plate number into his on-board computer, that there was an outstanding arrest warrant for the vehicle's owner. *Id.* at ¶ 2-3. When the officer activated his overhead lights in an attempt to stop the pickup truck, it swerved left of center and accelerated past another vehicle in an attempt to flee from the officer. *Id.* at ¶ 3. The officer then activated his siren and followed the vehicle, advising his shift supervisor over the police radio that he was engaging in a high-speed pursuit. *Id.* at ¶ 3-4, 39. During the course of the pursuit, the officer learned from the dispatcher that the outstanding warrant was for failure to appear in a neighboring county. *Id.* at ¶ 39. In communicating with the officer, the dispatcher referenced a code that indicated that the underlying offense was "minor" but the officer did not know the specific offense for which the pickup's owner had failed to appear. *Id.*

{¶52} The pursuit commenced at approximately 1:20 a.m. and took place "primarily outside the * * * city limits," reaching "top speeds of between eighty and ninety miles per hour." *Id.* at ¶ 2, 5, 29. There was little other traffic on the road at this time and the officer followed approximately 1/4 mile behind the pickup for most of the pursuit, slowing or stopping his patrol vehicle when he reached railroad crossings or stop signs to ensure that he could cross them safely. *Id.* at ¶ 29. Unlike in this case, however, in which Officer Leonbruno followed the Subaru for only 110 seconds, the officer in *Shalkhauser* pursued the pickup truck for nearly 11 minutes until it crashed into a vehicle driven by a third party. *Id.* at ¶ 5.

{¶53} The third party sued the city and the officer, alleging that the officer's conduct constituted gross negligence and/or willful, wanton or malicious misconduct. *Id.* at ¶ 6. The Ninth District affirmed the trial court's granting of summary judgment in favor of the officer on immunity grounds, rejecting the third party's claims that his experts' opinions on the applicable standard of care and the officer's alleged violation of the police department's pursuit policy created a genuine issue of material fact as to whether the officer acted wantonly or recklessly in pursuing the pickup. *Id.* at ¶ 41-42; *see also Sutterlin v. Barnard*, 2d Dist. Montgomery No. 13201, 1992 Ohio App. LEXIS 5170 (Oct. 6, 1992) (it could not be said that police officer, who attempted to stop a vehicle that had been exceeding the speed limit and crossing the center line, acted willfully or wantonly in continuing to pursue vehicle during one-minute, one-mile chase in which the vehicle reached a speed of 85 m.p.h., the officer was never closer than 10 car lengths to the vehicle and where officer could not have realized that vehicle was not going to stop until sixth-tenths of a mile into pursuit, such that officer had less than 30 seconds to decide whether to terminate the pursuit); *Lewis v. Bland*, 75 Ohio App.3d 453, 457-458, 599 N.E.2d 814 (9th Dist.1991) (no genuine issue of material fact that police officers did not act willfully or wantonly in the operation of their patrol vehicle during two-minute high-speed pursuit of speeding vehicle using "all of their warning devices to warn both the pursued vehicle and those in the vicinity"); *Rodgers v. DeRue*, 75 Ohio App.3d 200, 201, 204-205, 598 N.E.2d 1312 (11th Dist.1991) (police officer did not act "in deliberate or reckless disregard for the safety of others" during 15.6 mile high-speed

pursuit of speeding motorist through several communities, where pursuit occurred at 1:00 a.m. on rural roads, roads were dry, there was no other traffic on the road and officer activated his lights and siren, slowed to a stop at all controlled intersections, remained one-fourth to one-half a mile behind the pursued vehicle and was in regular radio contract with his department regarding the pursuit).

{¶54} After viewing the evidence in the light most favorable to Gates, we conclude that although Officer Leonbruno met his initial burden on summary judgment, Gates failed to meet his reciprocal burden of putting forth evidence of specific facts demonstrating a genuine issue of fact regarding whether Officer Leonbruno's conduct in following the Subaru was wanton or reckless. Thus, Officer Leonbruno was entitled to immunity under R.C. 2744.03(A)(6) and the trial court erred in denying Officer Leonbruno's motion for summary judgment on immunity grounds. Officer Leonbruno's assignment of error is sustained. The trial court's denial of Officer Leonbruno's motion for summary judgment is reversed.

{¶55} Judgment reversed; case remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover of appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR