[Cite as *Tufts Carter v. Hymes*, 2020-Ohio-3967.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

DENISE TUFTS CARTER,
ADMINISTRATOR,                         :

      Plaintiff-Appellee,            :            No. 108523

v.                                     :

OFFICER HYMES, ET AL.,                 :

      Defendants-Appellants.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART; REVERSED IN PART
**RELEASED AND JOURNALIZED:**  August 6, 2020

---

Civil Appeal from the Cuyahoga County Common Pleas Court
Case No. CV-18-892976

---

*Appearances:*

Friedman & Gilbert, Sarah Gelsomino, Jacqueline Greene,
and Terry H. Gilbert, *for appellee.*

Scott & Winters, and Joseph F. Scott, *for appellants.*

MICHELLE J. SHEEHAN, J.:

{¶ 1}  Defendants-appellants Officers Adam Hymes and Shane McNea appeal from a judgment of the Cuyahoga County Court of Common Pleas that denied their motion for summary judgment in an action filed by plaintiff-appTufellee

Denise Tufts Carter ("appellee" hereafter) as the administrator of the estate of Romero Brown.  After a careful review of the record and applicable law, we affirm the trial court's judgment as to McNea but reverse the judgment as to Hymes.

**Background**

{¶ 2}  In the early morning hours of August 17, 2016, Jonathan Grier drove a stolen BMW through a red light at the intersection of East 116th Street and Shaker Boulevard.  The BMW collided with a vehicle driven by Romero Brown, who died at the scene.  Sometime before the crash, McNea and Hymes were in a zone car following Grier's vehicle in an attempt to determine if there were warrants outstanding for the vehicle after spotting it at a closed gas station around 3:00 a.m.  McNea drove the zone car, and Hymes was responsible for operating the zone car's computer data unit and for the radio communication with the dispatch radio.

{¶ 3}  Grier was charged with aggravated vehicular homicide, attempted receiving stolen property, and failing to stop after an accident.  He pleaded guilty to all three charges and was sentenced to four years of imprisonment.  He admitted he was high on marijuana on the night of the incident.  The toxicology report shows Brown himself was also under the influence of marijuana.

{¶ 4}  The Cleveland Police Department conducted an investigation of the incident and subsequently initiated disciplinary proceedings against both officers in February 2017.  The two officers were charged with engaging in an unauthorized vehicle pursuit in violation of the department's pursuit policy and being untruthful during the interview with the police department Inspection Unit.  In March 2017, a

disciplinary hearing took place before Director of Public Safety Michael McGrath. After the hearing, Director McGrath dismissed the charges against both officers for insufficient evidence. No discipline was imposed on either officer.[1]

{¶ 5} A year later, in February 2018, appellee filed the instant action as the administrator of the estate of Romero Brown against McNea, Hymes, and Grier, asserting three claims: (1) willful, wanton, reckless, and negligent conduct; (2) wrongful death pursuant to R.C. 2125.02; and (3) survivorship action pursuant to R.C. 2305.21.

{¶ 6} Appellants moved for summary judgment, claiming immunity pursuant to R.C. 2744.02. They also claimed their conduct was not the proximate cause of the accident leading to Brown's death and that there was no evidence that Brown experienced conscious pain and suffering in support of a survivorship claim. The exhibits attached to their motion for summary judgment included the Police Field Report for the incident, an expert report, and a radio dispatch tape.

{¶ 7} Appellee opposed the officers' motion for summary judgment, attaching as exhibits the police department's charging letters issued to the two officers, the report of Sergeant Morales from the police department's Inspection Unit, the transcript of the disciplinary hearing against the two officers, the GPS maps showing Morales's notation for the zone car's speed at different points on

---

[1] Although the charges were dismissed and the officers were not disciplined for their conduct for the incident, both officers received a "Letter of Reinstruction," which instructed the officers that they "should have notified the Communications Control Section that the suspect vehicle fled from [them] at a high rate of speed."

East 116th Street, the Cleveland Police Department's Pursuit Policy, and an expert report.

## Police Field Report Regarding the Incident

{¶ 8} In the Police Field Report, Hymes provided a written statement regarding the incident, which was signed by both Hymes and McNea. It states:

> On 8/17/2016 at 0306 hrs while assigned to z/c 4A36 in company with P.O. McNea #779 while patrolling the area we observed a suspicious vehicle [FA JMA0715] at E. 116/Kinsman. We got behind it and the vehicle continued traveling North on E. 116 at a normal rate of speed. As we ran the license plate over channel 4 the vehicle began to pick up speed without us attempting any type of traffic stop. While we were waiting for radio to give us the license plate information the vehicle ran the red light at E. 116 and Shaker and crashed into another vehicle [ROMERO]. After clearing the intersection at E. 116 and Buckeye, we approached the crash scene and observed two males running from the suspect vehicle North West through the field. We immediately checked the driver of the victim's vehicle and notified radio to send EMS and fire [truck]. We were unable to get to the victim to perform first aid. * * *

## Radio Dispatch Tape

{¶ 9} The radio dispatch tape, attached as an exhibit to appellants' motion for summary judgment, recorded Hymes's communication with dispatch over the radio. He was first heard broadcasting the license plate number of the suspect vehicle — which lasted 18 second — and 20 seconds later he was heard reporting the crash at the Shaker Boulevard intersection. A total of 38 seconds elapsed between the moment Hymes started to broadcast the plate number and the moment Hymes reported the incident, and there was 20 seconds of silence between the broadcasting.

## Cleveland Police Department's Vehicular Pursuit Policy

{¶ 10} Pursuant to the Cleveland Police Department's vehicle pursuit policy, a vehicle pursuit "occurs when there is an active attempt by an officer in an authorized emergency vehicle to apprehend a suspect who is attempting to elude the police." Furthermore, officers may initiate a vehicle pursuit when the suspect operating the vehicle "refuses to stop at the officer's direction and flees apprehension for an actual or alleged (1) VIOLENT FELONY; or (2) Operating a Vehicle Intoxicated (OVI)." In addition, officers in a vehicle pursuit must comply with R.C. 4513.21 ("Horns, sirens, and warning devices").[2] Furthermore, the pursuing officer has the duty to notify the police department's Communications Control Section that a pursuit is underway and provide the reason for the pursuit, the direction of travel, information about the vehicle, and the speeds involved.

**The Police Department's Internal Investigation: Sergeant Morales's Report**

{¶ 11} Sergeant Morales of the Inspection Unit reviewed the radio dispatch tape and the officers' body camera footage and interviewed the two officers.

---

[2] R.C. 4513.21 states, in pertinent part:

Every emergency vehicle shall be equipped with a siren, whistle, or bell, capable of emitting sound audible under normal conditions from a distance of not less than five hundred feet and of a type approved by the director of public safety. Such equipment shall not be used except when such vehicle is operated in response to an emergency call or is in the immediate pursuit of an actual or suspected violator of the law, in which case the driver of the emergency vehicle shall sound such equipment when it is necessary to warn pedestrians and other drivers of the approach thereof.

{¶ 12} Hymes told Morales in the interview that he and his partner observed a suspicious vehicle at a closed gas station at East 116th Street and Kinsman Road. They began following the vehicle north bound on East 116th Street and ran the license plate. The vehicle then sped away from the officers at a high rate of speed. The zone car then attempted to catch up to the auto. He observed the vehicle pass through a red light at East 116th Street and Buckeye Road, still traveling at a high rate of speed. Because the suspect vehicle was traveling recklessly, the zone car "slowed way down" and stopped following it all together. From Buckeye Road, he saw the suspect vehicle, still speeding, run the red light at Shaker Boulevard and collide with another vehicle. When asked why they did not inform dispatch that the vehicle had sped away, Hymes stated that they were waiting for dispatch to give them back the information.

{¶ 13} McNea told Morales in the interview that the suspect vehicle sped away around Zelma George Recreation Center (around Imperial Avenue) and, when it sped away, he did not attempt to catch up to the suspect vehicle. McNea estimated he was travelling between 60-70 m.p.h. The officers did not notify dispatch when the vehicle fled from them "because it happened so fast." McNea insisted they were not attempting to pursue the suspect vehicle but only attempted to obtain its license plate number. McNea also stated the lights and siren were not activated because "the suspect auto was too far ahead and they did not have any information on the radio at that point."

{¶ 14} Based on the police department's "AVL," which is a data system capable of showing a zone car's speed every ten seconds, Morales prepared a "GPS Map-Logs" (plaintiff's exhibit No. 4). It showed the zone car's speed at 32 m.p.h. at Kinsman Road, which increased to 46 m.p.h. at Soika Avenue, 59 m.p.h. at Parkview Avenue, 70 m.p.h. at Harvey Avenue, a block from Buckeye Road, and slowed down to 54 m.p.h. at Buckeye Road. The zone car continued at 54 m.p.h. to the crash site at Shaker Boulevard. McNea's body camera, however, shows that after the officers arrived at the crash site, McNea was heard saying to another officer at the scene that "we came to a complete stop to clear the intersection at Buckeye." Morales concluded that the officers conducted an unauthorized pursuit of the BMW.

## The Disciplinary Hearing

{¶ 15} Morales testified at the officers' disciplinary hearing that the officers should have disengaged altogether after they obtained the license plate number yet they continued to follow the suspect vehicle at a high rate of speed. Morales testified that, based on his review of the "AVL," the zone car hit a top speed of 70 m.p.h. just before Buckeye Road. He opined that the officers were conducting a pursuit because the zone car was traveling at a high rate of speed following the suspect car. He faulted the officers for not informing dispatch that they were pursuing a suspect vehicle and also believed the officers were not completely truthful during his investigation of the incident.

## The Officers' Deposition Testimony

{¶ 16} Hymes testified in his deposition that the suspect BMW pulled out of the gas station and went north at a normal speed. The officers' vehicle followed it, and there were no vehicles in between. The BMW stopped at the red light at East 116th Street and Kinsman Road. Their police vehicle stopped as well. Hymes attempted to enter the BMW's Pennsylvania license plate number into the zone car's computer, which was operating slowly. When Hymes was still working on getting more information about the plate, the light turned green. Because Hymes did not write down the license plate number and it would be easier for him to obtain further information regarding the out-of-state license plate through the radio, McNea tried to catch up to the BMW so that Hymes could read the license plate number over the radio to dispatch. Hymes testified that they wanted to check the BMW for warrants because it was a dangerous neighborhood. He testified:

> Once we got the license plate, we slowed down. But we kept it in sight waiting for radio to let us know how it came back. [We want to know:] [d]id it come back with any warrants or was it wanted anywhere?

> We slowed down and kept it in sight. We observed it run a red light at Buckeye and we stayed slow but kept it in sight. We were still waiting to hear back from radio. And shortly after we went through the intersection of Buckeye, we observed a crash at Shaker.

{¶ 17} McNea testified that he slowed down significantly — with the tires screeching — at the red light at the Buckeye intersection. He did not come to a complete stop at the intersection but instead proceeded slowly through it after "clearing" the intersection. McNea testified that he did not turn on the emergency lights and siren because at the time he was still waiting for information on the

suspect vehicle from dispatch to determine whether they were going to stop the vehicle. McNea acknowledged that if an officer is in a vehicle pursuit, the lights and siren should have been activated. He testified, however, that he was not in pursuit of the BMW because, under the police policy, a pursuit would be allowed only for a violent felony and an OVI.

## The Experts

{¶ 18} The officers' expert William Eschenfelder submitted an affidavit and attached his accident reconstruction report. He estimated that at the time of the crash, the zone car was approximately 1,000 feet behind the BMW, near the Buckeye intersection. Eschenfelder concluded that even if the lights and siren had been activated, it would not have alerted Brown to the hazard of the oncoming BMW. Plaintiff's expert, Geoffrey Alpert, was deposed and opined that the actions of defendants Hymes and McNea in pursuing a suspicious vehicle at high rates of speed, against a red light, and without activating their emergency lights or sirens, was reckless, dangerous, and fell below generally accepted standards of policing.

{¶ 19} The trial court concluded that reasonable minds could conclude the defendant officers acted in a wanton or reckless manner, their conduct was the proximate cause of the accident, and the victim suffered pain and suffering prior to unconsciousness.

{¶ 20} This appeal follows. The officers raise two assignments of error. They state:

The trial court erred when it denied Defendants-Appellants' motion for summary judgment on the basis of R.C. 2744.02 immunity.

The trial court erred when it failed to separately consider Plaintiff-Appellee's claims against each of the Defendants-Appellants.

**Summary Judgment Standard**

{¶ 21} Summary judgment is appropriate where: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his or her favor. *Harless v. Willis Day Warehousing Co., Inc.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978); Civ.R. 56(C).

{¶ 22} Civ.R. 56(C) states that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." We review a trial court's grant of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

**{¶ 23}** On appeal, appellants only present the issue of immunity for our review.[3] Under the first assignment of error, they argue the trial court erred when it denied their motion for summary judgment on the basis of R.C. 2744.02 immunity. Under the second assignment of error, Hymes argues that, regardless of McNea's liability, he, as a passenger in the zone car who was responsible for communicating with the radio dispatch and operating the computer data unit, did not act recklessly and is entitled to immunity. For ease of discussion, we address the two assignments of error together.

## Statutory Political Subdivision Immunity Pursuant to R.C. 2744.03(A)(6)(b)

**{¶ 24}** Hymes and McNea contend that they are immune from liability under R.C. 2744.03(A)(6)(b) and the trial court erred in denying their motion for summary judgment. Ohio's Political Subdivision Tort Liability Act (R.C. Chapter 2744) absolves political subdivisions employees, including police officers, of tort liability, subject to certain exceptions. Pursuant to R.C. 2744.03(A)(6)(b), an employee of a

---

[3] Although the appellee's brief and appellants' reply brief additionally argue the issue of proximate causation, we note that "[a]n appeal from a denial of summary judgment based on sovereign immunity is limited to the review of alleged errors in the portion of the trial court's decision that denied the political subdivision the benefit of immunity." *Reinhold v. Univ. Hts.*, 8th Dist. Cuyahoga No. 100270, 2014-Ohio-1837, ¶ 21, citing *Riscatti v. Prime Properties Ltd. Partnership*, 137 Ohio St.3d 123, 2013-Ohio-4530, 998 N.E.2d 437, ¶ 20. Our review is limited to the issue of immunity. *See also CAC Bldg. Properties, L.L.C. v. Cleveland*, 8th Dist. Cuyahoga No. 91991, 2009-Ohio-1786, ¶ 9, fn. 1, citing under R.C. 2744.02(C) ("An order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order.").

political subdivision is immune from liability unless the employee's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." This standard applies to law-enforcement officers as well as other employees of political subdivisions. *See Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994). Appellee contends the trial court properly denied appellants' motion for summary judgment on immunity grounds pursuant to R.C. 2744.03(A)(6)(b) because the circumstances in this case create a genuine issue of fact as to whether the officers' actions were reckless.

{¶ 25} The Ohio Supreme Court has defined reckless conduct as conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, paragraph four of the syllabus. Recklessness "necessarily requires something more than mere negligence." *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 74, citing *Fabrey* at 356.

{¶ 26} Appellee claims the officers engaged in a vehicle pursuit. In evaluating an officer's conduct in vehicular pursuit cases, courts have taken into consideration factors such as:

> the speed limit of the road, the speed the officer was traveling, whether the officer was traveling in the wrong lane, the time of day, the weather, the officer's familiarity with the road, the extent to which there were other vehicles on the road, whether the officer attempted to pass the pursued vehicle or force it from the road, the nature and

seriousness of the offense(s) allegedly committed by the suspect, whether there was a safer alternative than continuing the pursuit, whether the officer admitted to disregarding the consequences of his actions, whether the officer's lights and sirens were activated and whether the political subdivision had a pursuit policy and, if so, whether that policy was followed.

*Gates v. Leonbruno*, 2016-Ohio-5627, 70 N.E.3d 1110, ¶ 40 (8th Dist.).

## Analysis

{¶ 27} It is undisputed that when the two officers were patrolling in the area of East 116th Street and Kinsman Road in a marked Cleveland police car at 3:00 a.m., they saw a BMW, which was later confirmed to be a stolen vehicle, stopped in a closed gas station near East 116th Street and Kinsman. McNea pulled into the gas station to investigate. As he did, the BMW pulled out and headed northbound on East 116th Street. The BMW began to speed, and the zone car followed it in increasingly high speed, without activating its emergency lights and siren. The BMW ran a red light in the intersection of East 116th Street and Buckeye Road; the zone car, slowing down at the intersection, proceeded through the red light as well. Moments after, the BMW collided with a vehicle driven by Brown at the intersection of East 116th Street and Shaker Boulevard.

{¶ 28} The parties dispute as to what occurred between the officers' zone car exiting the gas station to follow the BMW and the latter's collision with Brown's vehicle. Appellee characterized the officers' conduct as an unauthorized vehicle pursuit in violation of the police department's pursuit policy. The officers, while

acknowledging the high rate of speed the zone car was travelling, denied they were engaged in a vehicle pursuit.

{¶ 29} In the officers' account, after the BMW pulled out of the gas station, Hymes attempted to input the BMW's license plate number into the zone car's mobile computer unit to obtain information on the BMW. However, the unit was operating slowly, so Hymes decided instead to radio dispatch with the license plate number. As the BMW sped up, the zone car followed it to allow Hymes to read the license plate number to dispatch. The officers then attempted to keep the BMW in sight while waiting for dispatch to report back. The BMW ran the red light at East 116th Street and Buckeye Road at an excessive speed. The officers slowed down before the intersection but proceeded through the red light. As soon as the zone car traveled through the intersection, the BMW ran the red light at Shaker Boulevard and collided with Brown's vehicle. The officers explained that the emergency lights and siren were not turned on because they were not attempting to stop the suspect vehicle but only tried to keep sight of the vehicle while waiting for radio dispatch to provide them with further information on the vehicle's license plate.

{¶ 30} The officers contend that they are immune from liability because their conduct did not rise to the level of reckless conduct: the traffic was light; they followed the suspect vehicle from a distance; and the zone car slowed down to "clear" the intersection before it proceeded through the intersection of East 116th and Buckeye Road. They argue there was no evidence to support a finding of wanton or

reckless conduct as a mere 20 seconds elapsed between the time Hymes finished radioing the plate information and the time officers notified dispatch of the collision.

{¶ 31} Appellee claims that both officers acted recklessly in engaging in an unauthorized pursuit and failed to activate the zone car's lights and siren during the pursuit. Appellee argues that summary judgment is precluded because a reasonable jury could find that both officers acted in conscious disregard or indifference to a known risk of harm to other motorists and the indifference is unreasonable under the circumstances.

{¶ 32} Based on the record before us, viewing the evidence in the light most favorable to appellee, we conclude Hymes's actions did not rise to the level of recklessness. However, issues of fact exist regarding McNea's conduct in operating the zone car and whether a reasonable jury could find his actions were reckless.

**Officer Hymes**

{¶ 33} It is undisputed that McNea was in control of the zone car and Hymes was responsible for communicating with the radio dispatch and operating the zone car's computer data unit. Hymes first attempted to use the data unit to obtain information on the suspect vehicle. Because the unit was running slowly, he decided to relate the vehicle's license number to dispatch instead. In the officers' account of the event, McNea caught up to the BMW to allow Hymes to read the plate number. Appellee alleges Hymes asked McNea to do so. Regardless of whether this is true, McNea alone controlled the zone car and its speed. As to the emergency lights and siren, McNea testified at his deposition that, as the driver of the zone car, he was

responsible for activating these devices and further that, while a passenger would have the ability to operate the lights and siren, "it's not how we operate."

{¶ 34} Appellee also argues Hymes acted recklessly when he failed to communicate over the radio the fact they were following a suspect vehicle that was travelling in excess speed, in violation of the police department's vehicle pursuit policy. The police department's pursuit policy requires the pursuing officers to notify the Communication Control Section that a pursuit is underway. Even if the zone car following the suspect vehicle is characterized as a pursuit, the Ohio Supreme Court has held that a violation of departmental policy alone does not equate to per se recklessness. *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 21. "Recklessness requires knowledge by the actor that his 'conduct will in all probability result in injury.'" *Id.*, citing *O'Toole*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, paragraph three of the syllabus. When asked at his interview with Morales why he did not inform dispatch that the vehicle was speeding away from the zone car, Hymes explained that he was waiting for the radio to return information on the plate number before further communication with dispatch. Indeed, the evidence shows that the BMW and Brown's vehicle collided within 20 seconds of Hymes's completion of broadcasting the BMW's plate number over the radio. His failure to report the status of the zone car during this short period of time, even if it were a violation of the departmental policy regarding pursuit, did not rise to the level of conscious disregard of or indifference to a known risk that was unreasonable under the circumstances.

{¶ 35} Reviewing the evidence in the light most favorable to the plaintiff, we conclude that reasonable minds could only conclude that Officer Hymes's conduct as a passenger of the zone car was not reckless and he was entitled to immunity under R.C. 2744.03(A)(6). The trial court erred in denying his motion for summary judgment on immunity grounds.

**Officer McNea**

{¶ 36} Citing the zone car's speed, appellee characterizes McNea's conduct as engaging in an unauthorized vehicle pursuit. Appellee claims McNea acted recklessly and violated the departmental pursuit policy in pursuing the BMW and failed to activate the emergency lights and sirens during the pursuit.

{¶ 37} The Cleveland police departmental policy defines a vehicle pursuit as "an active attempt by an officer in an authorized emergency vehicle to apprehend a suspect who is attempting to elude the police." Sergeant Morales characterized McNea's operation of the zone car in high speed following the suspect vehicle as a pursuit and arguably operated the vehicle at speeds in excess of safe limits relative to the conditions. McNea denied he was in pursuit of the suspect vehicle and explained that he was only keeping up with the vehicle while waiting for dispatch to return information on the suspect vehicle's plate. As such, there is an issue of fact as to whether McNea's operation of the zone car constituted an unauthorized pursuit in violation of departmental policy and in a reckless manner. While a violation of a departmental policy enacted for the safety of the public is not per se wanton or reckless conduct, it may be relevant to determining the culpability of a course of

conduct. *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, at paragraph five of the syllabus.

{¶ 38} McNea testified that that he was not in pursuit of the BMW but only speeding up to catch up to the vehicle in order to allow Hymes to read its license plate. However, it appears from the AVL data that McNea continued to drive in excessive speed to follow the suspect vehicle even after Hymes obtained the license plate number, reaching a top speed of 70 mph before slowing down at the Buckeye Road intersection. While McNea testified that he came to a screeching stop at the red light at Buckeye Road, the AVL data shows the zone car's speed at 54 mph at that intersection. He did not activate the emergency lights and siren to warn the other motorists of a speeding police vehicle following a fleeing vehicle, whether or not it is characterized as a pursuit.

{¶ 39} Whether a political subdivision employee acted in a wanton or reckless manner under R.C. 2744.03(A)(6)(b) is generally a question of fact for the jury. *Fabrey*, 70 Ohio St.3d at 356, 639 N.E.2d 31; *Miller v. Hace*, 8th Dist. Cuyahoga No. 102500, 2015-Ohio-3591, ¶ 17. *See also Reynolds v. Oakwood*, 38 Ohio App.3d 125, 127, 528 N.E.2d 578 (2d Dist.1987) (the line between reckless conduct and ordinary negligence is often a fine one depending on the particular facts of a case and therefore it is generally recognized that such issue is for the jury to decide). Given the state of the evidence regarding Officer McNea's conduct, we conclude his following a suspect vehicle at a high speed, coupled with his lack of use of the emergency lights and siren to warn the other motorists, created a genuine

issue of material fact as to whether his conduct was reckless. *Id.* at paragraph two of the syllabus (although the use of the emergency lights and siren is a significant factor on the issue of whether the police officer acted in a willful or wanton manner, it is to be considered in conjunction with all the other circumstances). *See also Hardesty v. Alcantara*, 2015-Ohio-4591, 48 N.E.3d 127, ¶ 49 (8th Dist.) (the trial court properly found that genuine issues of material fact remained regarding whether an officer's actions during a pursuit of a suspect vehicle were wanton and reckless under R.C. 2744.03(A)(6)(b).) Viewing the evidence in a light most favorable to the appellee, reasonable minds could disagree on whether Officer McNea acted in a reckless manner in his operation of the zone car under the circumstances of this case, and therefore, the trial court properly declined to invade the province of the jury and deferred to the jury for a resolution of this issue.

{¶ 40} The first assignment of error is sustained as to Officer Hymes and overruled as to Officer McNea. The second assignment of error is sustained.

{¶ 41} The trial court's judgment as to Officer McNea is affirmed. Its judgment as to Officer Hymes is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant McNea and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
MARY J. BOYLE, P.J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION ATTACHED)

MARY J. BOYLE, P.J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 42} I agree with the majority to affirm the trial court's denial of summary judgment to defendant-appellant, Officer Shane McNea. I disagree, however, that we should reverse the trial court's denial of summary judgment to defendant-appellant, Officer Adam Hymes. I would affirm the trial court's decision in its entirety. I therefore concur in part and dissent in part.

## I. Procedural History and Factual Background

{¶ 43} In February 2018, plaintiff-appellee, Denise Tufts Carter, as the administrator of the estate of Romero Brown, filed an action against defendants alleging claims of wanton and reckless conduct, wrongful death, and survivorship. She also brought claims against Jonathan Grier, who was driving the vehicle that ran a red light at the intersection of East 116th Street and Shaker Boulevard, crashing into a vehicle driven by Brown, who died at the scene.

{¶ 44} In March 2019, Officers McNea and Hymes moved for summary judgment. Tufts Carter opposed. The following facts come from the opposing summary judgment motions.

{¶ 45} In the early morning hours of August 17, 2016, Officers McNea and Hymes were on routine patrol in a marked police car. Their shift began at 9:00 p.m. and ended at 7:0o a.m. Officer McNea was driving, and Officer Hymes was the passenger. Officer Hymes explained in his deposition that as the passenger, he was responsible for all radio communications and completing the paperwork required for their shift.

{¶ 46} Around 3:00 a.m., the officers were driving near East 116th Street and Kinsman Road in Cleveland, Ohio, when they noticed a grey BMW parked at a gas station. They believed the car to be suspicious because the gas station was closed and there were no other cars in the parking lot. The officers began to pull into the gas station to investigate, but as they did, the driver of the BMW, later identified to be Grier, pulled out and headed north on East 116th Street. The officers followed.

{¶ 47} The officers stated that the BMW stopped at a red light on East 116th Street at Kinsman Road, and when it did, they pulled immediately behind it. Officer Hymes began to run the license plate at the red light and noticed that the vehicle had a Pennsylvania license plate. According to Officer Hymes, there were a few "drop down screens" in the mobile data unit that you had to access before you could enter an out-of-state license plate so he was unable to enter the plate number into the

mobile system before the light turned green. He also stated that the mobile data unit appeared to be "slow or frozen."

{¶ 48} When the light turned green, the BMW continued driving north on East 116th Street. The officers followed. Officer Hymes had not written the BMW's license plate down, so he was still trying to read the plate number. According to Officer McNea, they drove behind the BMW at a "normal rate of speed" until the BMW sped away from them. Officer McNea stated that just as the BMW began to accelerate and speed away, Officer Hymes was able to read the license plate number to a dispatch operator.

{¶ 49} According to Officer Hymes, however, the BMW "began to accelerate" when the light turned green at the intersection of East 116th Street and Kinsman Road. Officer Hymes testified in his deposition that he "had Officer McNea attempt to catch up to the vehicle so we could get the license plate and run it over the radio." Officer Hymes stated that he radioed dispatch with the BMW's license plate number while they were near a recreation center located at East 116th Street and Parkview Avenue.

{¶ 50} The officers followed the BMW to keep it within their line of sight until they heard back from dispatch regarding information on the license plate. Officer McNea stated that while following the BMW, they saw it run a red light at the intersection of East 116th Street and Buckeye Road. By the time the officers had almost reached the intersection of East 116th Street and Buckeye Road, they saw the BMW run another red light at Shaker Boulevard and crash into Brown's vehicle.

{¶ 51} Officer McNea stated in his deposition that when they saw the crash, he turned the zone car's overhead lights on, but he could not recall if he turned the sirens on as well. Officer McNea explained that he turned the zone car's overhead lights on to alert the public to proceed with caution around the scene of the accident. Officer McNea agreed in his deposition that once the BMW was speeding, he could have turned on his overhead lights and sirens and initiated a traffic stop.

{¶ 52} Officer Hymes wrote in the police report that they followed the suspect vehicle on East 116th Street "at a normal rate of speed." He stated in the report that as "we ran the license plate" to dispatch, "the vehicle began to pick up speed without us attempting any type of traffic stop." He further stated, "While we were waiting for radio to give us the license plate information, the vehicle ran the red light at E. 116 and Shaker and crashed into another vehicle [ROMERO]. After clearing the intersection at E. 116 and Buckeye, we approached the crash scene[.]" Officer McNea signed the incident report that Officer Hymes wrote.

{¶ 53} Sergeant Michael Morales of the Cleveland Police Department Inspections Unit reviewed the incident. He reviewed the radio dispatch recordings and the body camera footage from both officers. He also interviewed Officers McNea and Hymes.

{¶ 54} In his administrative interview, Officer McNea stated that when he reached the red light at Buckeye Road, he slowed down and almost came to a complete stop to "clear the intersection." After he made sure it was safe to do so, he slowly "rolled" through the intersection. Officer McNea denied that he tried to catch

up to the BMW even though he admitted he got up to "60 to 70 m.p.h." while following the vehicle. Officer McNea stated that he did not call dispatch to tell them that the BMW had sped away from them at a high rate of speed because "it happened so fast." When asked if he was familiar with the department's pursuit policy, Officer McNea said that he was but that they "weren't on a pursuit."

{¶ 55} Officer Hymes stated in his administrative interview that when the light changed green at East 116th Street and Kinsman Drive, the BMW accelerated and began to pull away from their zone car. According to Officer Hymes, they accelerated to try to catch up to it so he could call the license plate in to dispatch. After he called in the license plate, he said that is when the BMW took off at a high rate of speed. Officer Hymes stated that when the saw the BMW take off, they "immediately slowed way down" and "stopped following the BMW altogether." When asked why they did not tell dispatch that the vehicle took off at a high rate of speed, Officer Hymes explained that they did not have a chance to do so and because they were waiting for dispatch to get back to them about the license plate. Officer Hymes said they were travelling above the speed limit, but he did not know how fast they were going. When told they got up to 70 m.p.h., Officer Hymes responded that they were "trying to catch up to get the plate." Officer Hymes also stated that they got "down to 15 m.p.h. around Buckeye" Road. He said that he felt they slowed "way down at Buckeye." After the crash, they learned the BMW was stolen.

{¶ 56} Sergeant Morales reported that both officers' body camera recordings show that they did not stop their zone car at Buckeye Road and that they proceeded

through the intersection at Buckeye Road travelling at a high rate of speed. Officer McNea can be heard telling another officer on his body camera footage that he came to a complete stop at the intersection of East 116th Street and Buckeye Road.

{¶ 57} Sergeant Morales prepared GPS map logs, which showed tracking from the officer's zone car that captured its speed every ten seconds. When the officers began following the BMW just after the intersection of East 116th and Kinsman Drive, they were travelling at 32 m.p.h. Ten seconds later, at Soika Avenue, they were travelling 46 m.p.h. Ten seconds after Soika Avenue, they were travelling 59 m.p.h. And ten seconds after that, they were travelling 70 m.p.h. just after passing Harvey Avenue, which is the street just before Buckeye Road. Finally, just after passing Buckeye Road, they were travelling at 54 m.p.h. and continued travelling at that speed almost until they reached the crash at Shaker Boulevard.

{¶ 58} According to the radio dispatch recording, Officer Hymes's report of the license plate number lasted 18 seconds. Twenty seconds later, Officer Hymes reported the crash. Thus, approximately 38 seconds passed from the time Officer Hymes first called dispatch until he reported the crash.

{¶ 59} The Cleveland Police Department's "Vehicle Pursuits" policy defines "vehicular pursuit" as "an active attempt by an officer in an authorized emergency vehicle to apprehend a suspect who is attempting to elude the police." The policy states that officers may initiate a vehicle pursuit when the suspect operating the vehicle refuses to stop at the officer's direction and flees apprehension for a violent felony or operating a vehicle while intoxicated. The officers are also required to

"immediately notify" the Communications Control Section that "a pursuit is underway" and "provide the reason for the pursuit, direction of travel, description of the vehicle, license plate number, number of occupants, and the speeds involved."

{¶ 60} Sergeant Morales concluded that Officers McNea and Hymes conducted an unauthorized pursuit of the BMW. He also found that they were untruthful in the investigation. Sergeant Morales recommended disciplinary action be taken against the officers for violating Cleveland Police Department's Vehicle Pursuit Policy and Emergency Response Driving Policy. Sergeant Morales further recommended that the officers be disciplined for not telling the truth and for unethical conduct in violation of the department's Manual of Rules and Regulations and Manual for Rules of Conduct.

{¶ 61} In February 2017, the city of Cleveland held a predisciplinary hearing against the officers. After the hearing, the city's Director of Public Safety Michael McGrath dismissed the charges against Officers McNea and Hymes. Although the charges were dismissed, both officers received a "Letter of Reinstruction," informing them that they should have notified the Communications Control Section that the suspect vehicle fled from them at a high rate of speed.

{¶ 62} An expert for Tufts Carter, Geoffrey Alpert, opined that Officers McNea and Hymers were involved in a "de-facto pursuit," which was against the police department's vehicle pursuit policy because Grier had not committed a violent felony or operated a vehicle while intoxicated. Further, the policy states that the police officers have a duty to notify the department's Communications Control

Center when they are pursuing a vehicle and to provide reasons for the pursuit, the direction of travel, information about the vehicle, and the speeds involved, which Officers McNea and Hymes failed to do. Alpert also concluded that Officer McNea drove the police car recklessly through the red light at the intersection of East 116th Street and Buckeye Road without their overhead lights and sirens activated and that both officers were untruthful in their reporting of what occurred. Alpert further concluded that the officers' actions in pursuing the BMW at high rates of speed without their lights and sirens activated were "reckless, dangerous, and fell below generally accepted standards of policing."

{¶ 63} The police officer's expert, William Eschenfelder, opined that the zone car was approximately 1,000 feet away from the crash when it occurred. Eschenfelder stated that because the offers were so far away from the intersection, even if the officers had activated their overhead lights and sirens, the lights and sirens would not have alerted Brown that the BMW was speeding through the intersection.

{¶ 64} The trial court denied Officers McNea and Hymes's summary judgment motion, and they appealed, asserting that they are entitled to immunity under R.C. 2744.03(A)(6)(b) as a matter of law.

## II. Summary Judgment Standard

{¶ 65} We review an appeal from summary judgment under a de novo standard. *Baiko v. Mays*, 140 Ohio App.3d 1, 10, 746 N.E.2d 618 (8th Dist.2000). Accordingly, we afford no deference to the trial court's decision and independently

review the record to determine whether summary judgment is appropriate. *Northeast Ohio Apartment Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997).

{¶ 66} Civ.R. 56(C) provides that before summary judgment may be granted, a court must determine that (1) there are no genuine issues of material fact remaining to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *State ex rel. Duganitz v. Ohio Adult Parole Auth.*, 77 Ohio St.3d 190, 191, 672 N.E.2d 654 (1996).

{¶ 67} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the movant fails to meet this burden, summary judgment is not appropriate, but if the movant does meet this burden, summary judgment will be appropriate only if the nonmovant fails to establish the existence of a genuine issue of material fact. *Id.* at 293.

## III. Immunity for an Employee of a Political Subdivision

{¶ 68} Police officers are political subdivision employees. *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994). Employees of a political subdivision are immune from liability unless "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" R.C. 2744.03(A)(6)(b).

{¶ 69} In this case, Tufts Carter does not assert that Officers McNea and Hymes acted with malicious purpose or in bad faith. Thus, the only issue in this appeal is whether there are genuine issues of material fact remaining as to whether the officers' acts or omissions were wanton or reckless.

{¶ 70} In *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, the Ohio Supreme Court set forth the meaning of the terms wanton and reckless conduct. The Supreme Court held:

> Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. (*Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977), approved and followed.)
>
> Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. (2 Restatement of the Law 2d, Torts, Section 500 (1965), adopted.)

*Anderson* at paragraphs two and three of the syllabus.

{¶ 71} The officers argue that they are immune from liability because there was no evidence that they were wanton and reckless. Officer Hymes maintains that he simply relayed information over the police dispatch radio in accordance with his duties as the passenger in the zone car. Officer Hymes further contends that he could not have been reckless because only a "mere 20 seconds elapsed between the time [he] first finished relaying the information and Hymes's subsequent broadcast to notify dispatch that the BMW had been involved in an accident."

{¶ 72} With respect to Officer McNea, he contends that he did not actively pursue the BMW as defined by Cleveland's departmental pursuit policy, which states that pursuit is "an active attempt by an officer in an authorized emergency vehicle to apprehend a suspect who is attempting to elude the police." He further contends that the vehicle only got up to 70 m.p.h., traffic conditions were light, and he followed the vehicle from a distance of about 1,000 feet. He also asserts that he slowed the zone car as he neared the intersection of East 116th Street and Buckeye Road to "clear" the intersection. Officer McNea maintains that "[t]here is simply no evidence to support a finding of wanton and reckless behavior in the 20 seconds that elapsed between the time the officers radioed the license information to dispatch and the time the officers subsequently notified dispatch that the suspect vehicle had been involved in a collision."

{¶ 73} Both officers rely heavily on the fact that only 20 seconds elapsed from the time they called in the license plate and the time of the crash. However, they followed the BMW for over 38 seconds before the crash (because they followed it for a short time before Officer Hymes was able to call in the license plate). And in those 38-plus seconds, Officer McNea drove from a stopped position to 70 m.p.h. when he "followed" the BMW, without activating the zone car's overhead lights and sirens. Although there was evidence that traffic was light, the speed limit was only 25 m.p.h. on East 116th Street. Further, the officers did not have reasonable suspicion or probable cause to initiate a traffic stop when they first began following the BMW out of the gas station, but they certainly did when the BMW violated several traffic laws.

These factors create genuine issues of material fact as to whether the officers were wanton and reckless.

{¶ 74} Further, Officer Hymes, as the passenger officer in the zone car, was in charge of communications. Reasonable minds could differ as to whether Officer Hymes should have followed the department's pursuit policy and notified the communications center that the BMW sped away from them at a high rate of speed and informed the communications center that their zone car also reached speeds of 70 m.p.h. when they were "following" the BMW. Although violation of departmental policies and procedures does not amount to per se reckless and wanton conduct, it "may be relevant to determine the culpability of a course of conduct." *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, at paragraph five of the syllabus. Further, despite the fact that Officer McNea testified at his deposition that he was in charge of activating the overhead lights and sirens in the zone car because he was driving, reasonable minds could differ as to whether Officer Hymes was wanton or reckless in failing to activate the lights and sirens when their vehicle reached very high speed while following the BMW in a 25 m.p.h. speed zone.

{¶ 75} The officers cite to *Gates v. Leonbruno*, 8th Dist. Cuyahoga No. 103738, 2016-Ohio-5627, in support of their argument that they are immune from liability. They claim that in *Gates*, this court held that the officer's conduct was not wanton and reckless when the officer travelled at speeds over 100 m.p.h., traffic was light, and the officer remained 800 to 1,000 feet behind the suspect vehicle. Although Officers McNea and Hymes are correct that we found the officer in *Gates*

to be immune from liability, *Gates* is distinguishable. The pursuit in *Gates* occurred on the highway, where the speed limit is much higher than it was in the present case. Further, the officer in *Gates* activated his overhead lights and sirens when he began the pursuit of the fleeing vehicle and immediately reported the pursuit to dispatch.

{¶ 76} Officers McNea and Hymes further cite to *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 772 N.E.2d 129 (9th Dist.2002), in support of their argument that they are immune from liability. They argue that the court in *Shalkhauser* held that the officer was immune from liability despite the pursuit of a vehicle because traffic was light and the evidence showed that the officer slowed for stop signs and railroad crossings. Again, *Shalkhauser* is distinguishable. The officer in *Shalkhauser* activated his overhead lights and sirens at the beginning of the pursuit, just after seeing the vehicle veer left of center and learning that the owner of the vehicle had an outstanding arrest warrant. Further,

> [t]he Medina Police Department had a fresh pursuit policy in effect at the time of the pursuit. In compliance with this policy, Officer Getto established radio communications with his shift commanding officer, Sergeant Horton. Also pursuant to the policy, Sergeant Horton assumed a supervisory role over the pursuit via radio communications with Officer Getto. Other members of the Medina Police Department joined Officer Getto in the pursuit of Leach in response to Sergeant Horton's request, and county sheriff's officers also rendered assistance.

*Id.* at ¶ 4.

{¶ 77} Thus, *Shalkhauser* does not support Officers McNea's and Hymes's position that they are immune from liability. Moreover, unlike the officer in *Shalkhauser* who slowed for stop signs and railroad crossings, the evidence

regarding whether Officer McNea sufficiently slowed the zone car through a red light at East 116th and Buckeye Road is in dispute.

{¶ 78} Accordingly, it is my view that Tufts Carter presented evidence that established genuine issues of material fact with respect to both Officers McNea and Hymes. I would therefore affirm the trial court's denial of summary judgment to the officers.